## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ———————————————— )<br>IN RE ENDANGERED SPECIES ACT )<br>SECTION 4 DEADLINE LITIGATION )<br>———————————————— )<br> )<br>This Document Relates To: )<br>*WildEarth Guardians v. Salazar*, )<br>Nos. 10-cv-0048; 10-cv-0421; )<br>10-cv-1043; 10-cv-1045; 10-cv-1048; )<br>10-cv-1049; 10-cv-1050; 10-cv-1051; )<br>10-cv-1068; 10-cv-2299; 10-cv-2595; )<br>and 10-cv-3366. )<br>———————————————— ) | Misc. Action No. 10-377 (EGS)<br>MDL Docket No. 2165 |

### JOINT MOTION FOR APPROVAL OF SETTLEMENT AGREEMENT
### AND ORDER OF DISMISSAL OF GUARDIANS' CLAIMS

Plaintiff WildEarth Guardians ("Guardians") and the Federal Defendants (the Secretary of the Interior, "Secretary," and U.S. Fish and Wildlife Service, "FWS" or the "Service") jointly move this Court to approve a Settlement Agreement ("Agreement") (attached hereto as Exhibit 1), negotiated between Guardians and FWS through the Court's voluntary mediation program and the parties' subsequent settlement discussions, and incorporate the terms of this Agreement into an order dismissing all twelve actions in this consolidated multidistrict litigation ("MDL") in which Guardians is the plaintiff.

As set forth in detail below, the Service and Guardians have entered into a comprehensive settlement that seeks to reduce deadline litigation over the Service's Endangered Species Act ("ESA" or the "Act") listing program and to extend the protections of the ESA to more species that warrant those protections.  Under the six-

year term of the Agreement, subject to certain conditions and limitations, the Service is agreeing to:

    i.    take certain specified ESA Section 4 actions during fiscal years 2011 and 2012, including issuance of many initial 90-day and 12-month findings on petitions to list species as well as proposed listing rules or not warranted findings for several "candidate" species for which the Service has previously found that listing is warranted but precluded by higher-priority actions; and

    ii.    over the remaining four fiscal years (2013-16), issue proposed listing rules or not-warranted findings for all remaining existing candidate species (as of November 10, 2010).

In total, the Service would make initial petition findings for over 600 species and issue proposed listing rules or not warranted findings for at least 251 species. The Service is not agreeing to reach any particular substantive decisions on petitions or agreeing to list any species. Rather, it is committing to make initial findings on listing petitions that are required by the ESA and to resolve the listing status of species – including either determining that listing is not warranted or, where listing is warranted, listing species pursuant to ESA notice-and-comment procedures – on a timetable that the Service believes is reasonable.

In exchange for this substantial workload commitment, Guardians is agreeing not to sue the Service on allegedly untimely petition findings or to challenge the Service's progress in listing candidate species during the six-year term of the Agreement plus six months (*i.e.,* through March 31, 2017). Also, Guardians would agree to a cap on the number of new listing petitions that it may file during the duration

of the Agreement.   In addition, the Agreement provides that, upon its approval, Guardians and the Federal Defendants will jointly move to dismiss five other cases that, although not consolidated in this MDL proceeding, involve challenges by Guardians or Guardians and co-plaintiffs to the Service's progress in listing candidate species.

The sole plaintiff in the remaining case consolidated in this proceeding, the Center for Biological Diversity ("CBD"), is not a party to this Agreement.   In a separate filing in CBD's consolidated case in this proceeding, the Service is providing notice of the filing of this Agreement.   While CBD is not a party to this Agreement, the Agreement resolves CBD's claims as explained below.   Accordingly, the Service shortly will file a motion to dismiss CBD's claims as moot or, if CBD is amenable, a stipulation of dismissal.

For the reasons set forth below, the Agreement meets all applicable standards for judicial approval of a consent decree, and it should be approved and entered by the Court.

## I.      STATUTORY AND FACTUAL BACKGROUND

### A.      The ESA Listing Process

The purpose of the ESA is to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered and threatened species."   16 U.S.C. § 1531(b).   The ESA defines "conservation" as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary." *Id.* § 1532(3).

The protective provisions of the ESA are not triggered for imperiled species, however, until after such species are officially "listed" as either "threatened species" or "endangered species" under the terms of the Act. *See id.* §§ 1533, 1536, 1538.

A species is listed as "endangered" if the Service determines that it is "in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6). A species is listed as "threatened" if the Service determines that it is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20). A "species" is defined to include "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." *Id.* § 1532(16).

The Secretary is required to list as either threatened or endangered any species facing extinction or endangerment due to any one, or any combination, of the following five factors:

(A)     the present or threatened destruction, modification, or curtailment of the species' habitat or range;

(B)     overutilization for commercial, recreational, scientific, or educational purposes;

(C)     disease or predation;

(D)     the inadequacy of existing regulatory mechanisms; or

(E)     other natural or manmade factors affecting the species' continued existence.

*Id.* § 1533(a)(1)(A)-(E).

The Secretary's decision whether to list a species is limited solely to consideration of these five factors.  In considering these factors, the Secretary must use only "the best available scientific and commercial information regarding a species' status, without reference to possible economic or other impacts of such determination."  50 C.F.R. § 424.11(b); *see also* 16 U.S.C. § 1533(b)(1)(A).

Once a species is listed, the ESA provides strong legal protections to encourage the species' recovery.  The ESA requires the Secretary, to the maximum extent prudent and determinable, to designate critical habitat for all threatened and endangered species concurrently with their listing and subsequently to develop recovery plans for such species.  16 U.S.C. § 1533(a)(3), (f).  The ESA also requires that all federal agencies "carry out programs for the conservation" of threatened and endangered species and consult with the Secretary in order to ensure that their actions are "not likely to jeopardize the continued existence" of such species or "result in the destruction or adverse modification" of their critical habitat.  *Id.* § 1536(a)(1), (2).  Additionally, the ESA prohibits any person from "taking" a threatened or endangered species.  *Id.* § 1538(a)(1)(B); 50 C.F.R. §§ 17.21, 17.31.  To "take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).

Any interested person may file a petition with the Secretary to list a species as threatened or endangered under the ESA.  *Id.* § 1533(b)(3)(A); 50 C.F.R. § 424.14(b).  The ESA establishes a process and timeline for determining whether the listing of a species is merited under the terms of the Act pursuant to a citizen petition.  Specifically, the ESA provides that, within 90 days after receiving a petition from any person, to the

maximum extent practicable, the Secretary shall make an initial finding ("90-day finding") as to "whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted."   16 U.S.C. § 1533(b)(3)(A).  "Substantial information" is that "amount of information that would lead a reasonable person to believe that the measure proposed in the petition may be warranted."  50 C.F.R. § 424.14(b).

If the Secretary makes a positive 90-day finding, then the Secretary must commence a status review of the species concerned.   16 U.S.C. § 1533(b)(3)(A); 50 C.F.R. § 424.14(b)(3).  After the status review, the Secretary must, within 12 months of receiving the petition, make a determination as to whether the petitioned action (in this scenario, listing the species as threatened or endangered) is "warranted," "not warranted," or "warranted, but precluded" by higher-priority actions.  16 U.S.C. § 1533(b)(3)(B); 50 C.F.R. 424.14(b)(3).  This determination is known as a "12-month finding."

If the Secretary finds that listing the species under the ESA is warranted, he must promptly publish a proposed listing regulation ("Proposed Rule") in the *Federal Register*. 16 U.S.C. § 1533(b)(3)(B)(ii).  Within one year of publication of a Proposed Rule, the Secretary is required to render a final determination (to list the species or withdraw the Proposed Rule), or, if there is substantial disagreement about scientific data, delay a final determination for up to six months to solicit more scientific information.  16 U.S.C. § 1533(b)(6)(A)(i)(III), (B)(i).

As described above, the Service need not publish a Proposed Rule for a species that the Service concludes warrants listing if it makes a "warranted-but-precluded"

finding.  *Id.* §  1533(b)(3)(B)(iii).   To make a "warranted-but-precluded" finding, the Service must determine that:

> (I)      the immediate proposal and timely promulgation of a final regulation implementing the petitioned action . . . is precluded by pending proposals to determine whether any species is an endangered species or a threatened species; and
>
> (II)      expeditious progress is being made to add qualified species to either of the lists [of threatened or endangered species] and to remove from such lists species for which the protections of this Act are no longer necessary.

*Id.*  The Service must publish its "warranted-but-precluded" finding in the *Federal Register* together with a description and evaluation of the reasons and data on which the finding is based.  *Id.*

In addition to the process described above for the listing of species pursuant to a citizen petition, the Service also may list species as endangered or threatened on its own initiative, which the Service refers to as the "candidate process."  *Id.* § 1533(a)(1).  Under the candidate process, the Service identifies species that warrant listing, and either proposes them for listing or, if issuance of a Proposed Rule is precluded by higher-priority listing activities, designates the species as candidates for listing.  *See*, *e.g.*, 64 Fed. Reg. 57,534 (Oct. 25, 1999).

For any petitioned action that the Service determines is warranted but precluded, the ESA requires the Service to treat the petition, as of the date of that finding, as a petition that has been resubmitted and that has been determined to present substantial scientific or commercial information indicating that the petitioned action may be

warranted.   16 U.S.C. § 1533(b)(3)(C)(i).   As a means of tracking these resubmitted petitions, or warranted-but-precluded findings, the Service adds species with warranted-but-precluded findings to the same list of species that the Service has determined to be candidates for listing.   The Service makes its required annual findings on these species through a document known as the Candidate Notice of Review ("CNOR"), which is published in the *Federal Register*.   Although the Service acknowledges that the listing of all such "candidates" is "warranted" based on the best available data – *i.e.*, that such species need the protections of the ESA in order to avoid extinction or endangerment – candidate species do not receive the legal protections of the ESA.

### B.       The Service's Implementation of the ESA Listing Process

For at least the last 15 years, the Service has been significantly hindered in its efforts to implement the species listing process envisioned by the ESA.   This situation has arisen primarily for three reasons. First, most of the steps in the listing process – specifically those relating to the issuance of 90-day and 12-month petition findings, and the issuance of a final listing rule following a proposed listing rule, as well as critical habitat designations – have statutory deadlines, as described above, while the issuance of a proposed rule for listing candidate species or species for which the Service has made a warranted-but-precluded finding lacks a statutory deadline.   *Compare id.* § 1533(b)(3)(B)(i), (iii) and 4(b)(6) *with id.* § 1533(b)(3)(B)(ii).   Second, the Service has a limited budget for ESA section 4 listing actions, which by law it may not exceed.[1]   Third,

---

[1] *See*, *e.g.*, Pub. L. No. 111-88, 123 Stat. 2904, 2908 (Oct. 30, 2009) (providing that in FY 2010 "not to exceed $22,103,000 shall be used for implementing subsections (a), (b), (c), and (e) of section 4 of the Endangered Species Act," with an exception for activities relating to removal of species from ESA protection).   This prohibition is referred to as the "listing cap."   Moreover, within the funding allowed by the listing cap, there is an

because of this funding constraint and other resource constraints and the volume of species listing petitions and related litigation, the Service has been forced to allocate most of its scarce ESA listing program resources to actions that have statutory deadlines, mainly 90-day and 12-month petition findings and critical habitat designations, and has been unable to issue Proposed Rules for listing many species.

As a result, many species for which the Service has made warranted-but-precluded findings or which have been designated as candidates for listing through the Service's candidate process have remained on the candidate list awaiting publication of a proposed listing rule for long periods of time. During this period, those species have not benefited from the legal protections of the ESA. On November 10, 2010, the Service published the most recent CNOR, identifying 251 species that are candidates for protection as threatened or endangered species ("2010 CNOR"), 75 Fed. Reg. 69,222. Many of these 251 candidate species have been on the candidate list for more than 10 years.

### C. Guardians' Efforts to Use the ESA Listing Process

Over the past several years, Guardians has taken a number of actions all directed at adding species to the list of threatened and endangered species under the ESA. It has submitted petitions to list over 700 species as endangered or threatened. In addition, Guardians has brought substantial litigation related to the Service's alleged failure to timely respond to these petitions and its alleged failure to make expeditious progress in adding species to the threatened and endangered species list.

---

additional limit on the amount that can be spent on designating critical habitat for already listed species ($10,518,583 in FY 2010). This is referred to as the "critical habitat subcap." The Anti-Deficiency Act provides criminal sanctions for expending funds in excess of appropriations, including violating these caps. 31 U.S.C. § 1341(a)(1).

**1.      Guardians' Petition Deadline Litigation**

Guardians has filed dozens of lawsuits seeking to enforce the ESA's deadlines for making petition findings.   Specifically, with respect to this MDL proceeding, on December 23 and 26, 2009; January 8, 12, 26, and 28, 2010; February 8, 11, and 12, 2010; and March 15, 2010, Guardians filed ten complaints for declaratory and injunctive relief alleging that the Secretary failed to comply with a statutory duty to make 12-month findings on petitions to list 12 species as threatened or endangered under the ESA, Nos. 1:09-2290 and 1:09-2997 (D. Colo.); Nos. 1:10-0048 (D. D.C.), 1:10-57 (D. Colo.), 1:10-169 (D. Colo.), and 3:10-53 (D. Nev.); Nos. 1:10-256 (D. Colo.), 6:10-122 (D.N.M.), and 1:10-263 (D. Colo.); and No. 1:10-421 (D.D.C.), respectively.   On June 8, 2010, the Judicial Panel on Multidistrict Litigation ("Panel") transferred all of the above-listed cases to the U.S. District Court for the District of Columbia, MDL No. 2165.   On June 29, 2010, this Court consolidated all of these actions.

In addition, on September 20, 2010, and October 25 and 27, 2010, Guardians filed three additional complaints for declaratory and injunctive relief alleging that the Secretary failed to comply with a statutory duty to make either a 90-day finding or a 12-month finding on petitions to list nine Texas mollusks, the Utah population of the gila monster ("gila monster"), and the Mexican wolf, Nos. 4:10-cv-03366 (S.D. Tex.), 10-cv-02595 (D. Colo.), and 2:10-cv-02299 (D. Ariz.), respectively.   On December 6, 2010, and January 3, 2011, this Court consolidated the nine Texas mollusks, gila monster, and Mexican wolf cases with this action as tag-along cases.

Despite the substantial number of cases in this MDL proceeding for which Guardians is a plaintiff, this number represents only a fraction of over 100 additional

species that Guardians has petitioned the Service to list and on which Guardians could file suit today seeking court orders compelling the Service to issue 12-month petition findings.

### 2.       Guardians' Warranted-But-Precluded Litigation

In addition, Guardians, or Guardians acting with co-plaintiffs, has brought five cases challenging warranted-but-precluded findings issued by the Secretary. *WildEarth Guardians v Salazar*, Civ. No. 4:10-420 (D. Ariz.); *WildEarth Guardians v. Guertin, et al.*, Civ. No. 1:10-1959 (D. Colo.); *WildEarth Guardians v. Salazar*, Civ. No. 1:10-2129 (D. Colo.); *Biodiversity Conservation Alliance, et al. v. Kempthorne, et al.*, Civ. No. 04-2026 (D.D.C.); and *Western Watersheds Project, et al. v. Salazar*, Civ. No. 4:10-229 (D. Idaho).   In each of these five warranted-but-precluded cases, Guardians and its co-plaintiffs are alleging that the Secretary has failed to make expeditious progress in adding species to the threatened and endangered species list.   These five cases have not been consolidated in this MDL proceeding, but the Parties herein believe that the Agreement will likely resolve the claims asserted by Guardians and its co-plaintiffs in these cases. As relevant here, the Court's approval of this Agreement would not dismiss these five warranted-but-precluded cases.   Rather, the Agreement provides that, upon its approval, Guardians and the Federal Defendants will jointly move to dismiss these five cases in their respective courts, as discussed below in II.B.

Guardians has brought all of this petition deadline and warranted-but-precluded litigation for the purpose of obtaining more progress by the Service in listing species that need the protections of the ESA. *See*, *e.g.*, Federal Defendants' Motion to Transfer Actions, MDL No. 2165 (March 29, 2010) ("Federal Defendants' Motion to Transfer

Actions") at Exhibit 2 (Guardians' Dec. 28, 2009 press release).  In particular, one of Guardians' key reasons for filing the deadline litigation consolidated in this MDL proceeding was to obtain a settlement or other remedy under which the Service would not only make 90-day and 12-month findings on Guardians' petitions but also issue proposed listing rules for species on the candidate list.

### D.     The Service's Objectives in this Multidistrict Litigation

From the beginning, the Service took the position that a central issue presented by the litigation consolidated in this MDL proceeding is how the Service can conduct an effective ESA Section 4 listing program that balances Congress's intent that the Service timely make findings on citizen listing petitions and conduct rulemakings to list species that need the protections of the ESA.  *See* Federal Defendants' Motion to Transfer Actions at 11-12.  As noted above, the Service has a single, limited budget for listing activities and a large volume of work that must be funded out of this budget.  The Service wants to make greater progress in resolving the status of the many species that are candidates for listing.  However, the Service cannot achieve this goal if it must devote disproportionate funding and staffing resources to making 90-day and 12-month petition findings, which are only the initial steps in the process and alone do not result in the listing of species and the extension of protections under the ESA.

Accordingly, from a very early stage in the parties' settlement negotiations, the Service sought to reach an agreement acceptable to the parties that would provide for a coordinated timetable for the 90-day and 12-month petition findings directly at issue in this consolidated litigation but would also reserve sufficient resources to allow the Service to conduct rulemakings to list qualified species and designate critical habitat.

The Service believes that over time the Agreement will enable the Service to restore the necessary balance in its listing program. The Service also believes that the Agreement reserves sufficient discretion for the Service in the exercise of that program. This assessment is based on the Service's careful consideration of its budget and current legal obligations, as well as its more than 30 years of experience conducting the ESA section 4 listing program – especially its experience dealing with extensive deadline litigation over the past 15 years.

### E.     The Settlement Negotiations

On July 27, 2010, pursuant to the Court's Initial Practice & Procedure Order, Docket ("Dkt.") 2, the parties submitted a Proposed Joint Case Management Plan, Dkt. 8, in which the parties requested a 60-day stay of proceedings to allow the parties to engage in settlement discussions. The parties also requested the referral of this case to a voluntarily appointed mediator, as provided by the U.S. District Court for the District of Columbia Mediation Program ("Mediation Program"), for purposes of facilitating settlement discussions. On August 3, 2010, the Court entered an order referring this case to the Mediation Program. On September 17, 2010, the parties submitted their respective confidential mediation statements to the court-appointed mediator.

Over the following seven months and pursuant to several extensions of the mediation period, the court-appointed mediator (Mr. Robert Fisher) and representatives of the Service, the U.S. Department of the Interior, the U.S. Department of Justice, Guardians, and CBD participated in very extensive settlement negotiations. These negotiations included three all-day in-person meetings and dozens of telephone conferences and email exchanges. Two of the in-person meetings occurred at Service

headquarters in Arlington, Virginia (on September 24, 2010, and December 13, 2010). One in-person meeting was held at a Service facility in Denver, Colorado (on November 9, 2010). The Agreement was the product of this extensive mediation process, combined with subsequent settlement negotiations, and represents a good-faith effort by the Service and Guardians to settle this litigation consistent with the letter and purposes of the ESA.

Pursuant to the Court's March 8, 2011, order, the mediation closed on April 13, 2011. Despite best efforts, the mediation did not result in a settlement agreement acceptable to all parties. Following the close of mediation, the parties continued their settlement discussions. As requested by the parties, the Court stayed the litigation for an additional 30 days, until May 20, 2011. During this period, the Service and Guardians were able to come to terms on the proposed settlement reflected in the Agreement. The Service was not able to reach settlement with CBD. However, as explained further below, the Parties herein believe that the Agreement resolves all of CBD's claims in this litigation. Thus, approval of the Agreement effectively would end this litigation.

## II.   THE COURT SHOULD APPROVE THE SETTLEMENT AGREEMENT AND ENTER AN ORDER OF DISMISSAL OF GUARDIANS' CLAIMS

### A.   Standard of Review

The principles that apply to judicial review of a consent decree are well-established. In general, a court should enter and approve a consent decree if it is "consistent with the statute the consent [decree] is to enforce and fairly resolves the controversy in a manner consistent with the public interest." *Citizens for a Better Env't v. Gorsuch*, 718 F. 2d 1117, 1128 (D.C. Cir. 1983) (citing *United States v. Trucking Employers*, Inc., 561 F.2d 313, 317 (D.C. Cir. 1977)), *cert. denied*, 467 U.S. 1219 (1984)). "Thus the function of the reviewing court is not to substitute its judgment for

that of the parties to the decree, but to assure itself that the terms of the decree are fair and adequate and are not unlawful, unreasonable, or against public policy." *United States v. District of Columbia*, 933 F. Supp. 42, 46-47 (D.D.C. 1996) (citations omitted).

The Court should be guided by the principle that "[f]ew public policies are as well established as the principle that courts should favor voluntary settlements of litigation by the parties to a dispute." *American Sec. Vanlines v. Gallagher*, 782 F.2d 1056, 1060 (D.C. Cir. 1986) (citations omitted)). "Not only do settlement agreements 'produce a substantial savings in judicial resources,' but they also 'promote efficient use of private resources by reducing litigation and related costs.'" *Wright v Foreign Serv. Grievance Bd.*, 503 F. Supp. 2d 163, 176 (D.D.C. 2007) (quoting *American Sec. Vanlines*, 782 F.2d at 1060)*. "In order to encourage these public policies, 'settlement agreements are to be upheld whenever possible.'" *Id.* (quoting *American Sec. Vanlines*, 782 F.2d at 1060).

A consent decree must spring from, and serve to resolve, a dispute within the court's subject-matter jurisdiction, and come within the general scope of the case made by the pleadings.  *See Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO v. City of Cleveland*, 478 U.S. 501, 525 (1986).  However, the Court is not required to determine whether or not the plaintiff would have prevailed on its specific claims to approve the settlement.  "It is the agreement of the parties, rather than the force of the law upon which the complaint was originally based, that creates the obligations embodied in a consent decree."  *Local No. 93*, 478 U.S. at 522; *see also Gorsuch*, 718 F.2d at 1126 ("The court's duty when passing upon a settlement agreement is fundamentally different from its duty in trying a case on the merits.");  *United States v. Armour & Co.*, 402 U.S. 673, 681-82 (1971) ("Naturally, the  agreement  reached  [in  a  consent  decree]  normally

embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation.").

Consistent with these principles, a reviewing court is not limited to approving relief that the plaintiff requested in its complaint. *See Sierra Club v. Browner*, Civ. A. Nos. 92-124 (NHJ), 93-125, 93-197 and 93-564, 1994 WL 750290 (D.D.C. Sept. 20, 1994) (approving a consent decree in which EPA agreed to steps beyond the specific relief requested in the complaint, where the court had jurisdiction over the claims raised in the complaint and the actions to be taken were consistent with the operative statute); *NRDC v. Whitman*, No. C99-03701WHA, 2001 WL 1221774 (N.D. Cal. Sept. 24, 2001) (approving consent decree where steps to be taken by agency were not sought in the complaint, but were consistent with the statute, "directly responsive" to the pleadings, and "further[ed] the broad objectives upon which the complaint was based").

Furthermore, "where a government agency charged with protecting the public interest has pulled the laboring oar in constructing the proposed settlement, a reviewing court may appropriately accord substantial weight to the agency's expertise and public interest responsibility." *Bragg v. Robertson*, 83 F. Supp. 2d 713, 717 (S.D. W.Va. 2000); *see also United States v. Montrose Chem. Corp.*, 50 F.3d 741, 746 (9th Cir. 1995).

**B.      Terms of the Settlement Agreement**

Below is a summary of the key terms of the Agreement:

(1)      The Agreement provides that the Service shall complete all the actions identified in the Service's work plan for fiscal years ("FYs") 2011 and 2012 (attached to the Agreement as Exhibit B) no later than the fiscal years specified in the work plan and

that, in addition, the Service shall submit a proposed listing rule or a not-warranted finding to the *Federal Register* for the Mexican wolf no later than the end of FY 2012. Agreement ¶ 1.  This provision, requiring the Service's implementation of its two-year work plan, will resolve (1) all of the allegedly overdue 90-day and 12-month findings at issue in CBD's case in this consolidated litigation and (2) many of the petition finding deadlines at issue in Guardians' cases in this consolidated actions.  It will also avoid immediate and inefficient interruption of the Service's ongoing work.

(2)   The Agreement provides that the Service shall, for all 251 species that were designated as "candidates" in the 2010 CNOR, submit to the *Federal Register* for publication either a proposed listing rule or a not-warranted finding no later than September 30, 2016, including a proposed listing rule or a not-warranted finding for the following species no later than the end of the specified fiscal year: New Mexico meadow jumping mouse by FY 2013; Pacific fisher by FY 2014; and greater sage-grouse, including any Distinct Population Segments, by FY 2015.  *Id.* ¶ 2.  This provision prioritizes the resolution of the status of the candidate species, for which the Service has found that listing is warranted but precluded by higher-priority actions.  The specific dates for the New Mexico meadow jumping mouse, Pacific fisher, and greater sage-grouse are intended to facilitate the resolution of related warranted-but-precluded litigation discussed below.

(3)   The Agreement provides that the Service shall submit a proposed listing rule or a not-warranted finding to the *Federal Register* for the Sonoran desert tortoise no later than the end of FY 2015.  *Id.* ¶ 3.  This provision is intended to avoid the filing of additional warranted-but-precluded litigation by Guardians.

(4)     The Agreement provides that the Service shall submit to the *Federal Register* a proposed rule to amend the Distinct Population Segment boundaries for the Canada lynx to include New Mexico no later than the end of FY 2013.  *Id.* ¶ 4.  This provision is intended to resolve an existing warranted-but-precluded case brought by Guardians, as discussed below.

(5)     The Agreement provides that the Service shall submit a 12-month finding to the *Federal Register* for the rattlesnake-master borer moth no later than the end of FY 2013.  *Id.* ¶ 5.  This provision is intended to resolve a listing petition filed by Guardians that was not included in the Service's two-year work plan described above.

(6)     The Agreement also provides interim benchmarks for measuring the Service's timely and good faith implementation of its agreement to take final action on all species in the 2010 CNOR by September 30, 2016.  *Id.* ¶ 6.

(7)     The Agreement further provides that for each proposed listing rule submitted to the *Federal Register* in accordance with the operative paragraphs of the Agreement, the Service shall make a final listing determination in accordance with the statutory deadlines provided in 16 U.S.C. § 1533(b)(6)(A)-(B), and shall make a final determination on the proposed critical habitat designation for the jaguar in accordance with the statutory deadlines provided in 16 U.S.C. § 1533(b)(6)(A)-(B).  Agreement ¶ 7. This provision is intended to avoid the creation of potential new violations of the statutory deadlines governing the ESA listing process.

(8)     The Agreement also sets forth the Service's intention, for all species subject to final listing rules promulgated in accordance with the operative provisions of the Agreement, to designate critical habitat concurrently with the final listing rule to the

maximum extent prudent and determinable, in accordance with 16 U.S.C. § 1533(a)(3).

However, the Agreement provides that the Service's failure to designate critical habitat

concurrently with a final listing rule does not constitute a violation of this Agreement,

and that Guardians agrees that it will not bring litigation to compel such concurrent

critical habitat designation for these species during the term of the Agreement.

Agreement ¶ 8.  This provision of the Agreement is consistent with Guardians' and the

Service's desire to prioritize the resolution of the listing status of the candidate species

above related statutory requirements, while striving to maintain balance in the listing

program.

(9)     The Agreement provides that, subject to enumerated limited exceptions,

prior to March 31, 2017, Guardians shall not file any lawsuit to enforce the statutory

deadlines governing petition findings in 16 U.S.C. § 1533(a) and (b) or to challenge any

warranted-but-precluded finding in accordance with 16 U.S.C. § 1533(b)(3)(B)(iii) for

any species within the jurisdiction of the Department of the Interior.  Agreement ¶ 9.

This provision of the Agreement is intended to provide the Service with relief from

litigation in order to allow the Service to prioritize the resolution of the status of the

candidate species.

(10)     The Agreement sets forth Guardians' and the Service's agreement that

compliance with the timetables for resolving the status of candidate species outlined in

the Agreement constitutes expeditious progress in adding qualified species to the list of

threatened and endangered species and that, if executed and implemented, the Agreement

will provide for the Service's orderly administration of its ESA section 4 listing program,

including the reduction of the number of candidate species.  The Agreement also

recognizes the Service's conclusion that fulfilling the commitments in the Agreement, along with other commitments required by court orders or court-approved settlement agreements already in existence as of the signing of this Agreement (listed in Exhibit A attached to the Agreement), will require substantially all of the resources in the Service's ESA Section 4 listing program, and sets forth Guardians' acceptance of this conclusion for the purposes of entering into and facilitating compliance with this Agreement.  *Id.* ¶ 10.

(11)   The Agreement also provides that in order to allow the Service to conduct an ESA section 4 listing program with a balanced output of petition findings, proposed and final listing determinations, and proposed and final critical habitat designations, Guardians will not submit new petitions to list more than 10 species in any fiscal year (October 1 through September 30) from the date this Agreement becomes effective until September 30, 2016.  *Id.* ¶ 11.

(12)   The Agreement provides that, if it is entered by this Court, Guardians and the Service will file joint motions to dismiss the following five warranted-but-precluded cases with prejudice:  *WildEarth Guardians v Salazar*, Civ. No. 4:10-420 (D. Ariz.); *WildEarth Guardians v. Guertin, et al.*, Civ. No. 1:10-1959 (D. Colo.); *WildEarth Guardians v. Salazar*, Civ. No. 1:10-2129 (D. Colo.); *Biodiversity Conservation Alliance, et al. v. Kempthorne, et al.*, Civ. No. 04-2026 (D.D.C.); and *Western Watersheds Project, et al. v. Salazar*, Civ. No. 4:10-229 (D. Idaho).   This provision of the Agreement recognizes Guardians' and the Service's agreement that the schedule outlined in the Settlement represents expeditious progress in resolving the status of the 251 candidate species in the 2010 CNOR and that the Agreement contains specific dates by which the

Service will resolve the warranted-but-precluded status of the individual species named in these five actions.  Agreement ¶ 12.  However, in approving the Agreement, the Court would not be dismissing these five warranted-but-precluded cases.  Rather, Guardians and FWS are simply agreeing to seek dismissal in those cases, which would only be granted by the courts where the litigation is located.

(13)    The Agreement sets out Guardians' and the Service's agreement to use their best efforts to ensure that litigation filed by non-signatories to this Agreement to enforce the statutory deadlines in 16 U.S.C. § 1533(a)-(b) or to challenge the merits of a listing or critical habitat petition finding or rulemaking does not interfere with the Service's ability to satisfy their obligations under this Agreement.  Agreement ¶ 13.

(14)    The  Agreement  also  reflects  and  specifically  recognizes  various assumptions the Service has made about its ability to fulfill the requirements of the Agreement.  *Id.* ¶ 14.  The Agreement sets forth provisions for modification upon motion and a showing of good cause or by stipulation, and provides for termination in certain limited circumstances.  *Id.* ¶ 15.  Finally, the Agreement contains a dispute resolution provision, *id.*, and provides for an annual meeting and conference between Guardians and the  Service  to  discuss  implementation  of  the  Agreement  and  possible  necessary modifications, *id.* ¶ 17.

(15)    Upon entry of this Agreement by the Court, the parties request that, pursuant to Federal Rule of Civil Procedure 41(a)(1), the claims in the Guardians' complaints as to those species listed in Exhibit B or paragraphs 1 through 5 of the Agreement be dismissed with prejudice and the claims in the Guardians' complaints as to the remaining species be dismissed without prejudice.  Notwithstanding the dismissal of

these actions, Guardians and the Service stipulate and respectfully request that the Court retain jurisdiction to oversee compliance with the terms of this Agreement and to resolve any motions to modify such terms. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375 (1994).

###     C.        The Settlement Agreement Meets the Applicable Standards

As discussed below, the Agreement before this Court satisfies all applicable standards and should be entered. The Agreement is "consistent with the statute the consent [decree] is to enforce," and it fairly and reasonably resolves the controversy in a manner consistent with the public interest. *Gorsuch*, 718 F. 2d at 1117. The Agreement resolves disputes between FWS and Guardians that are within the Court's subject-matter jurisdiction, and is within the general scope of the case made by the pleadings. *Local No. 93*, 478 U.S. at 525. In fact, the Agreement resolves this litigation in a manner that plainly furthers the purposes of the ESA – by providing for more expeditious action on required and necessary ESA section 4 listing determinations. In the Service's judgment as the expert agency, the Agreement also is in the public interest, and does not unduly restrict the Service's discretion.

The proposed settlement reached by FWS and Guardians is a comprehensive one. Not only would it resolve the specific challenges to the overdue petition findings directly at issue in this consolidated litigation, but the Agreement would also establish a feasible timetable for the Service to perform other necessary actions sought by Guardians, including the issuance of proposed listing rules for the Service's large existing backlog of species that are candidates for listing.

As discussed above, the petition findings directly at issue in this MDL litigation address only the first step of the listing process, *i.e.*, making initial 90-day and 12-month findings on petitions for the listing of species.  However, in order for the Service to make these petition findings in a timely and efficient manner that is consistent with the agency's other statutory obligations under the ESA, the Service must have sufficient resources to address the last step of the Service's listing process, *i.e.*, the issuance of proposed and final rules for the listing of species.  At present, there are a significant number of pending listing petitions, including the petitions at issue, that will require 90-day and 12-month findings by the Service pursuant to the first step of the listing process <u>and</u> a significant number of "candidate" species for which the Service has previously determined that listing is warranted but the agency lacks sufficient resources to complete the last step of the listing process in order to put in place the protections of the Act (*i.e.*, species for which the Service has made warranted-but-precluded findings).  This growing dual backlog of petition findings and candidate species effectively precludes the Service from responding timely to petitions at the beginning of the listing process while at the same time adding species to the list of endangered or threatened species at the end of the listing process.

This Agreement seeks to untie this knot by establishing a six-year timetable that would address both ends of the Service's listing process – initial petition findings and proposed and final listing rules.  Thus, the Agreement negotiated between Guardians and the Service resolves not only the existing Guardians cases in this consolidated action, but also provides a feasible and reasonable timetable for issuing proposed listing rules or not-warranted findings for the existing 251 candidate species.  In the Agreement, Guardians

commits to forbear from filing additional similar petition deadline litigation.   The Agreement also provides a potential basis for other courts to dismiss the existing cases challenging warranted-but-precluded findings in which Guardians is currently a plaintiff, and seeks to avert the filing of additional warranted-but-precluded litigation by Guardians and potentially other parties.   The goal is reduced litigation and a more balanced allocation of the Service's limited ESA section 4 resources going forward that will allow the Service to list species that need the protections of the ESA.

In reaching this Agreement, both Guardians and FWS have recognized that the listing of species as threatened or endangered is the keystone of the ESA.   Only final listing rules provide deserving species with all of the substantial protections provided by the Act.   Thus, to invoke the full protections of the ESA for species that warrant listing, the Service must propose and finalize listing rules for those species.   As stated above, petition findings are only the first steps along this path.   Guardians and FWS have further recognized that the Service's listing program will be more efficient and effective if it is able to devote more of its resources to completing a balanced workload of petition findings, proposed and final listing rules, and critical habitat determinations, and less of its resources to litigation.   As a practical matter, the Service will be unable to list the species directly at issue in this consolidated litigation, even if those species deserve to be listed, absent progress by the Service on the candidate species backlog.   Therefore, an agreement limited to providing deadlines for the specific petition findings at issue in this case would further neither the parties' objectives nor the objectives of the statute.

The principal thrust of the Agreement is that for the next six years Guardians will refrain from litigation compelling 90-day and 12-month findings on new listing petitions

submitted by Guardians and will limit the number of listing petitions it submits per year in exchange for the Service's agreement to make certain 90-day and 12-month petition findings directly at issue in this litigation, take other specific ESA section 4 listing actions during the first two years of the Agreement, and take final action to resolve the listing status of the 251 candidates for ESA listing identified in the 2010 CNOR (*i.e.*, to issue proposed and final listing rules or make not-warranted findings for those species). In short, the Agreement to some degree prioritizes extending ESA protections to the species that FWS determines warrant protection in a final listing rule above requiring the Service to make more 90-day and 12-month petition findings for other species. Given the current candidate-species backlog, just requiring the Service to make more petition findings can only be expected to result in additional warranted-but-precluded findings and further expansion of the already-large backlog of candidate species.

The Agreement does not require the Service to reach any particular substantive outcome as to any of the required ESA section 4 actions, *e.g.*, to make a positive 90-day or 12-month finding on a petition or to list a species as threatened or endangered. Rather, the Agreement requires the Service to make the identified petition finding (positive or negative) or to issue a <u>proposed</u> listing rule. As required by the ESA and the Service's regulations, a full notice-and-comment opportunity will be provided before any species is listed as threatened or endangered. 16 U.S.C. § 1533(b)(5)-(6); 50 C.F.R. § 424.16-424.17.

In summary, this Agreement will resolve the claims currently at issue in this consolidated case, will prevent the filing of an even greater amount of anticipated petition deadline litigation by Guardians and/or other litigants, furthers the purposes of the ESA,

is in the public interest, is fair and equitable, and is within the general scope of the case made by the pleadings.  The Agreement, if approved by the Court, will allow the Service to meet its ESA Section 4 listing obligations more efficiently and expeditiously and without being mired in resource-consuming litigation.  By doing so, the Agreement would result in the extension of ESA protections to many more deserving species than otherwise would have been the case.

## III.    CONCLUSION

For the foregoing reasons, the Service and Guardians respectfully request that the Court approve the Agreement and dismiss Guardians' actions in this consolidated action.

Dated:  May 10, 2011                              Respectfully submitted,

IGNACIA S. MORENO
Assistant Attorney General
SETH M. BARSKY
Section Chief
KRISTEN L. GUSTAFSON
Assistant Section Chief
MEREDITH L. FLAX
Senior Trial Attorney


*/s/ Clifford E. Stevens, Jr.*
CLIFFORD E. STEVENS, JR.
Trial Attorney
H. HUBERT YANG
Trial Attorney
United States Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
601 D Street, N.W.
Washington, DC 20004
Tel: (202) 305-0210
Fax: (202) 305-0275
E-mail: clifford.stevens@usdoj.gov
E-mail: hubert.yang@usdoj.gov

*Attorneys for Federal Defendants*

*/s/ Jay Tutchton*
JAY TUTCHTON
WildEarth Guardians
6439 E. Maplewood Avenue
Centennial, CO 80111
Tel: (720) 301-3843
E-mail: jtutchton@wildearthguardians.org

*Attorney for Plaintiff WildEarth Guardians*